# CARROLL-BOONE WATER DISTRICT and McGOODWIN, WIlLIAMS AND YATES, INC. *v.* M. & P. EQUIPMENT COMPANY, SAFECO INSURANCE COMPANY OF AMERICA, and HERCULES, INC.

83-38                  661 S.W.2d 345

Supreme Court of Arkansas
Opinion delivered November 14, 1983
[Rehearing denied January 9, 1984.*]

*HOLLINGSWORTH, J., not participating.

*W. S. Walker; Epley, Epley & Castleberry, Ltd.,* and *Friday, Eldredge & Clark,* by: *Robert V. Light,* for appellant Carroll-Boone Water District.

*Wright, Lindsey & Jennings,* for appellant McGoodwin, Williams and Yates, Inc.

*Herby Branscum, Jr.* and *Ashley & Ashley,* for appellee M. & P. Equipment Company.

*Warner & Smith,* by: *Douglas O. Smith, Jr.* and *G. Alan Wooten,* for appellee Hercules, Inc.

*Peterson, Young, Self & Asselin; James B. Blair,* and *Cypert & Roy,* for appellee Safeco Insurance Company of America.

JOHN I. PURTLE, Justice. The issues of this case were submitted to a Carroll County jury on interrogatories. The jury determined that: the engineering firm of McGoodwin, Williams & Yates, Inc., proximately contributed 100% of the negligence in regard to the damages in this case; McGoodwin was the agent of the owner, Carroll-Boone; the absence of builder's risk insurance on behalf of the contractor, M. & P., materially altered Safeco's performance bond for M. & P.; the owner sustained damages in the amount of $639,927.33; M. & P. sustained damages in the amount of $219,279.71; and the owner still owed M. & P. $174,735. The owner, Carroll-Boone and the engineer, McGoodwin, appeal from the findings and judgment of the trial court. The arguments will be set out and discussed below. We modify the judgment and remand the case.

The facts reveal that on April 28, 1976, Carroll-Boone Water District engaged the services of McGoodwin, Williams & Yates, Inc. as engineer to plan and follow construction of a water intake structure on Beaver Lake in Carroll County, Arkansas. McGoodwin prepared the plans and specifications for the intake structure and invited bids on same. M. & P. Equipment Company was the successful bidder and as such obtained a performance bond, as required by the contract, from Safeco Insurance Company of America. The contract between the owner and the contractor dated July 27, 1977, required a builder's risk policy be obtained by the contractor. The owner and the contractor were to be insured by the policy as their interests might appear. The owner, engineer and contractor were all charged with seeing that the builder's risk policy was obtained. Although the engineer informed the contractor that all was in order to proceed with construction, the builder's risk policy was never procured.

After the intake apparatus was constructed it became necessary to remove the land mass between the completed structure and the lake in order to allow the water to be

received by the water intake system. The area to be removed contained mostly rock and it was necessary to use blasting procedures in order to loosen the rock for removal. The contractor had originally wanted to tunnel to create an access between the water and the intake but the engineers overruled the idea and required open blasting.

M. & P. contracted with Hercules, Inc. to furnish the blasting material and a supervisor for the blasting sequences. It was agreed that the blasting would be done in three separate shots on different dates. The first two went off without any problems. The contractor, engineer, owner and Hercules were present for the first two shots. The Hercules representative was not present for the third and final blast; however, he did approve the contractor's plans for this last shot. The contractor had prepared the completed structure in accordance with the engineers' plans and specifications. After the third blast it was discovered that the intake unit had suffered severe damage which the contractor unsuccessfully attempted to repair. The engineer refused to give instructions for repairs but did draw up plans or solicit bids from other contractors. M. & P. spent $219,279.71 trying to repair the damage. Safeco refused to undertake repairs because no builder's risk policy had been procured.

The owner filed suit against M. & P., Safeco and Hercules, and eventually filed a cross complaint against McGoodwin. M. & P. filed a counterclaim against Carroll-Boone and a third party complaint and suit for contribution against McGoodwin, alleging McGoodwin was an agent for the owner. A claim for the balance due under the contract was included in the contractor's counterclaim against the owner. At the conclusion of the 14 day trial the matter was submitted to the jury on interrogatories. The interrogatories and the jury's answers to them are set out as follows:

INTERROGATORY NO. 1: Do you find from a preponderance of the evidence that M. & P. Equipment Company was guilty of negligence which was a proximate cause of the occurrence?

ANSWER: No.    DATE: 4/14/82

INTERROGATORY NO. 2: Do you find from a preponderance of the evidence that Hercules, Inc. was guilty of negligence which was a proximate cause of the occurrence?

ANSWER: No.     DATE: 4/14/82

INTERROGATORY NO. 3: Do you find from a preponderance of the evidence that McGoodwin, Williams & Yates, Inc. was guilty of negligence which was a proximate cause of the occurrence?

ANSWER: Yes.     DATE: 4/14/82

INTERROGATORY NO. 5: Do you find that M. & P. Equipment Company breached its agreement with Carroll-Boone Water District to build the project in accordance with the plans and specifications which failure resulted in damages to Carroll-Boone Water District?

ANSWER: No.     DATE: 4/14/82

INTERROGATORY NO. 6: Do you find that Jack Barton was incompetent to perform the work that he undertook in connection with the blasting on this project, and that such incompetence was a proximate cause of the occurrence?

ANSWER: No.     DATE: 4/14/82

INTERROGATORY NO. 8: Do you find from a preponderance of the evidence that during the course of the project McGoodwin, Williams & Yates was acting as the agent of Carroll-Boone Water District?

ANSWER: Yes.     DATE: 4/14/82

INTERROGATORY NO. 9: Do you find from a preponderance of the evidence that the absence of builders risk insurance for the project constituted a material alteration to the contract bonded by Safeco?

ANSWER: Yes.    DATE: 4/14/82

INTERROGATORY NO. 10: State the amount of any damages (exclusive of liquidated damages as provided in the contract between Carroll-Boone and M. & P.) which you find from a preponderance of the evidence were sustained by Carroll-Boone Water District as a result of the damage to the intake structure.

ANSWER: $639,927.33    DATE: 4/14/82

INTERROGATORY NO. 11: State the amount of any liquidated damages as provided in the construction contract which you find from a preponderance of the evidence Carroll-Boone Water District is entitled to recover from M. & P. Equipment Company, Inc.

ANSWER: None.    DATE: 4/14/82

INTERROGATORY NO. 12: State the amount of any damages which you find from a preponderance of the evidence were sustained by M. & P. as a result of the occurrence.

ANSWER: $219,279.71    DATE: 4/14/82

The court then entered judgments as follows:

Carroll-Boone was awarded judgment against Mc-Goodwin in the amount of $639,927.33 for their negligence;

M. & P. was awarded judgment against Carroll-Boone for the sum of $219,279.71 and Carroll-Boone the same amount over against McGoodwin;

M. & P. was awarded $174,735 against Carroll-Boone for the unpaid balance on the construction contract;

The complaint and all cross complaints against Safeco were dismissed;

The complaint and cross complaints against Hercules, Inc. were dismissed.

Carroll-Boone's complaint and all cross complaints against M. & P. were dismissed, and all costs were assessed against McGoodwin.

Carroll-Boone and McGoodwin moved for judgments N.O.V. and for a new trial which motions were denied by the court. Both parties then gave notice of appeal. We do not set out each argument for reversal as they will be discussed separately. The judgments will be affirmed as modified.

The first argument is that the court erred in permitting the jury to decide the question of agency between the owner and the engineer. This question was presented to the jury as interogatory No. 8 and was answered in the affirmative. It is insisted by appellants that no factual issue on the question of agency developed during the trial. The contract between the owner and the engineer was a standard form used by most architect/engineers. The contract provided, among other things, that the engineer would perform studies, design and prepare plans and specifications, and furnish engineering surveillance and inspection during construction of the project. All of these duties were set out in detail in the body of the contract but we do not set them out because after reviewing the contract we are of the opinion that it does not of itself create an agency relationship. We will have to look elsewhere to determine if other factors created an agency situation. We have searched the record and cannot find evidence that McGoodwin did anything other than that prescribed in its contract with the owner.

The parties have all relied on our previous decisions relating to the relationship between and owner and architect/engineer. In the case of *Erhart v. Hummonds*, 232 Ark. 133, 334 S.W.2d 869 (1960), we affirmed a judgment against the architect who was by express contract supervising construction of the job for the owner. This supervision was in addition to the duties of an architect as provided in the standard architect/engineer contract. There was no such additional agreement in the present case. In *Inc.*

*Town of Bono* v. *Universal Tank & Iron Works,* 239 Ark. 924, 395 S.W.2d 330 (1965), we held that the standard language used in the architect/engineer contract did not create an agency relationship whereby the architect/engineer could bind the owner in attempting to grant an extension of time to the contractor within which to complete the project. In *Bono* we stated:

> The architect's authority is limited. He may not direct the work to be done otherwise than is provided by the plans and specifications, except as he has been given authority to do so therein or by the contract.

In *Walker* v. *Wittenberg, Delony & Davidson, Inc.,* 241 Ark. 525, 412 S.W.2d 621 (1966), we considered the liability of an architect to an injured employee of a contractor. Upon rehearing we held that before an architect could be considered to be exercising direct control of a contractor with respect to day to day safety supervision such agreement must clearly appear from the terms of the agreement, the conduct of the parties or the nature of the work. *Walker* v. *Wittenberg, Delony & Davidson, Inc.,* 242 Ark. 97, 412 S.W.2d 621 (1967). However, agency was not considered in *Walker* II. In *Erhart, supra,* there was an inherently dangerous condition included in the construction project and the architect had knowledge that the condition needed immediate attention. Furthermore the architect's employee was actively involved in bringing about the injuries. *Walker* I is of little value because on rehearing we decided it differently. In *Walker* II we held that the architect was not exercising control over a contractor by the terms of the contract between the owner and the architect. The contract in *Walker* II appears to be the same as the contract in the present case. Therefore we hold that before an architect/engineer becomes an agent for the owner such authority must be contained in the terms of the contract, the nature of the work, or the conduct of the parties. There being no such evidence in the present case, we hold it was error to submit the matter to the jury.

The second issue we consider is whether the trial court improperly presented to the jury the question of material alteration of the contractor's agreement to obtain a builder's

risk policy. Interrogatory No. 9, answered affirmatively by the jury, was whether the absence of a builder's risk policy constituted a material alteration to the contract with Safeco, as surety on the contractor's performance bond. The contract between the owner and contractor provided that work would not commence until all required insurance was in force. Builder's risk insurance was not taken out by the contractor. The effective date of the builder's risk was to be when the owner had any insurable property at the site. By the terms of the contract the builder's risk was not necessary before work commenced even though one clause seemed to indicate otherwise. In any event, it should have been in force on the date the structure was damaged. The contract required the owner to approve all insurance policies. Apparently none of the parties to this action realized the builder's risk coverage had not been procured until after the loss. Mr. Sweeney was an agent for Safeco and as such issued the performance bond guaranteeing performance by the contractor. The contractor relied upon Sweeney to place the builder's risk policy in force at such time as the owner acquired an insurable interest. Therefore, Safeco is charged with notice such as was had by Sweeney, who was receiving progress reports from Mr. Patton (contractor) on a regular basis. *Standard Motors Finance Co.* v. *Mitchell Auto Co.,* 173 Ark. 875, 293 S.W. 1026 (1927). Sweeney was aware of the requirement for builder's risk coverage.

The problem presented here is whether Safeco's performance bond contract was materially altered or whether there was simply a breach of contract. In determining whether an alteration is material the courts look to see whether the surety has been placed in a position different from that which it promised to guarantee. *National Bank of Eastern Arkansas* v. *Collins,* 236 Ark. 822, 370 S.W.2d 91 (1963). The alteration is not material unless the surety is placed in the position of doing more than the undertaking contained in the performance bond. Failure to do an act required to be done by the surety's agreement is a breach of the contract rather than a material alteration. The contract between the owner and the contractor specifically required the contractor to obtain a builder's risk policy. This was one of the provisions of the contract to be performed by the

contractor. Builder's risk coverage was primarily for the benefit of the owner. In any event, the surety had knowledge of the failure to procure the builder's risk because Sweeney was agent for both the contractor and the surety. We find no Arkansas case directly on point; however, we are persuaded of the correctness of our position by the case of *Hartford Fire Insurance Co.* v. *Riefolo Construction Co., Inc.*, 81 N.J. 514, 410 A.2d 658 (1980). *Hartford* differs from the present case only in that the contractor had obtained builder's risk coverage but had allowed it to lapse. The New Jersey Supreme Court held the failure to maintain builder's risk insurance was a breach of contract and the contractor's surety was liable for the contractor's failure to perform. According to Black's Law Dictionary 171 (5th ed. 1979), a breach of contract is "[f]ailure, without legal excuse, to perform any promise which forms the whole or part of a contract." Clearly the contract between the owner and the contractor expressly required a builder's risk policy. The performance bond contained the following paragraph:

> Provided, further, that the said Surety, for value received hereby stipulates and agrees that no change, extension of time, alteration or addition to the terms of the contract or to the work to be performed thereunder or the specifications accompanying the same shall in any wise affect its obligation on this bond, and it does hereby waive notice of any such change, extension of time, alteration or addition to the terms of the contract or to the work or to the specifications.

Neither the surety agreement nor the facts relating to failure to obtain the builder's risk policy are in dispute. Therefore, it was error for the trial court to submit interrogatory No. 9 to the jury. Safeco, the surety, was not released from its obligations contained in the performance bond. Therefore, the owner is entitled to recover from the surety.

We next consider the matter of absolute or strict liability. Appellants argue that appellees are strictly or absolutely liable for damages resulting from blasting. It is not disputed that employees of M. & P., in cooperation with

Hercules, detonated the explosives on the property of the owner and that the plans and specifications had required that the rock be removed by blasting. The owner and the engineer were present when the damage occurred. The damage in the present case occurred on the appellant/owner's premises and to its own property. We do not know whether the jury found the damage resulted from the blast or from the force of the water and missiles rushing against the intake structure creating what it termed "the dam break effect." We treat the argument because it was possible the jury could have found either type damage resulted from the negligence of the engineer. There was testimony that all the damage occurred below the level which would have been affected by blast damage alone.

Strict liability is a harsh rule and should be applied only in very limited situations. Due to the destructive nature and inherent danger involved in blasting, a majority of jurisdictions, including Arkansas, have adopted the rule of strict liability. *Western Geophysical Co.* v. *Mason*, 240 Ark. 767, 402 S.W.2d 657 (1966). We agree with the decision in *Mason* and affirm the rule of strict liability in blasting cases. However, when blasting is conducted on the property damaged with the knowledge and consent of the owner the rule of strict liability is not applicable. In 35 C.J.S. *Explosives*, § 8 (1960) it is stated:

> The rule that one who, by blasting, throws rocks and material on the adjacent land of his neighbor is liable for the damage resulting from such act without regard to the question of negligence, has no application where the person blasting has the right to the use of the land on which the blasted material is thrown.

It would be unfair to allow a property owner to employ a contractor to use dynamite on the property and then recover for damage caused by the dynamite, with no proof of negligence. 31 Am.Jur.2d *Explosions and Explosives*, § 47 (1967). Since the case of *Holden* v. *Carmean*, 178 Ark. 375, 10 S.W.2d 865 (1928), this court has applied the rule of strict liability for blasting resulting in injuries to third parties. Even applying our rule of strict liability for damages

resulting from the use of explosives the owner in the present case is not entitled to damages. Therefore, the trial court did not err in refusing to instruct the jury on strict liability.

It is also argued that the court erred in awarding judgment to M. & P. for $219,279.71. M. & P. was awarded judgment against the owner, and the court granted judgment over against the engineer in favor of the owner in the same amount. The jury and the court determined that the engineer was 100% at fault for all damages incurred by the contractor and the owner. The court should have awarded M. & P. a judgment against the engineer but not against the owner, because M. & P. breached its contract, as we point out later on.

It is argued that AMI 203 should have been given. No one offered such an instruction or even suggested it to the trial court. ARCP, Rule 51, requires a specific objection to giving or failing to give an instruction before error may be argued on appeal. *Chandler and Ramsey* v. *Kirkpatrick,* 270 Ark. 74, 603 S.W.2d 406 (1980). The reporter's notes to ARCP, Rule 49 (b) state that courts have the power and authority to correct or reconcile inconsistent answers to interrogatories submitted to the jury. It is obvious the trial court attempted to have the jury answer all factual disputes and we think he did so. The factual issues were decided against the engineer and in favor of the contractor. Each interrogatory answered by the jury is a special verdict on that particular fact. *McChristian* v. *Hooten,* 245 Ark. 1045, 436 S.W.2d 844 (1969). One verdict found the contractor to be without fault and another found the engineer entirely at fault. Therefore, we uphold the judgment of the contractor against the engineer.

Another argument for reversal is that the trial court erred in refusing to instruct the jury that M. & P. breached its contract to build the project. Regardless of the propriety of giving such an instruction, the undisputed evidence does show that M. & P. breached its contract. It had agreed to build the concrete intake structure, which it did. But it also agreed to dynamite a channel from the lake to the structure, and in that phase of the work the concrete structure was

extensively and seriously damaged by the effects of the blasting. M. & P. argues that it followed the plans and specifications, but the manner in which the blasting was to be carried out was not detailed by the plans, nor was the engineer asked to provide such plans. M. & P. worked with a Hercules representative in planning the blasting, without assistance from the engineer. Some sort of blasting schedule, not shown by the abstract, was submitted through the engineer to the Corps of Engineers so that the Corps could take safety precautions for persons in the vicinity, but there is no indication that the engineering firm assumed responsibility for the actual blasting plan.

Hence the real question for the jury was not whether M. & P. breached its contract, but which party was at fault. The jury exonerated both M. & P. and Hercules from any negligence and attributed all the negligence to the engineer. That conclusion was supported by the testimony of the expert witness Oriard, who testified that the blasting could have been done without damaging the structure by not fragmenting the rock so extensively as was done by the third dynamite shot. He also attributed responsibility to the engineer by testifying that the engineer could have designed the structure to withstand the blast or have defined for the contractor what limits of force the actual structure would withstand or have insisted that the contractor's blasting plans be submitted for approval. The court did submit the matter of comparative negligence to the jury, which found on substantial evidence that the engineer alone was responsible.

The engineer here argues the court erred in failing to give an instruction stating the standard of care for engineers was the "same locality." The court rejected the proffered instruction. Appellant engineer misreads AMI 1501 and *Gambill* v. *Stroud,* 258 Ark. 766, 531 S.W.2d 945 (1975). AMI 1501 states that the standard which is to be applied is that "in the locality in which he practices," or "similar locality." This instruction applies only to physicians, surgeons and dentists. In *Stroud* we held that the standard required of physicians and dentists was not limited to the "same locality" but rather extended to similar practice in similar

localities, giving consideration to location, size and character of the community.

To limit the standard of care required of a professional to one locality would lead to no standard in some cases. Where a professional is the only one in a community his standard would automatically be the gauge of proficiency. There is nothing in the record of this case to indicate that locality affects in any manner the degree of skill and knowledge required of a design engineer. The Arkansas General Assembly did not see fit to include any other profession in the similar locality rule as found in Ark. Stat. Ann. § 34-2614 (Supp. 1983), which governs the degree of skill and learning required of the medical profession. It was the duty of the engineer to offer a proper instruction. ARCP, Rule 51. Appellant McGoodwin argues that a proper instruction was offered and is set out at R. 3834. We find the proffered instruction but its wording is "same locality." Since Arkansas does not have the "same" or "similar" locality rule for any profession other than medical it was not error for the court to reject the appellant engineer's instruction.

It was not error to award M. & P. damages in the amount of $219,279.71 because the testimony of Mr. Patton was not disputed. The contractor was ordered by the engineer to return to work after the damage occurred; however, no instructions were given as to the manner in which repairs were to be made. The jury determined that the contractor was not negligent and did not breach the construction contract and that the engineer was 100% responsible for the damages. There being no contract on the repairs attempted by M. & P., it was proper to allow the jury to determine the amount owed for this work.

In *Texarkana Housing Authority* v. *Johnson Const. Co., Inc.*, 264 Ark. 523, 573 S.W.2d 316 (1978), we held that the owner who furnished the plans and specifications was liable to the contractor for damages resulting from faulty plans and specifications. There we stated:

> We are persuaded that where, as here, the owner supplies plans and specifications to a contractor detail-

> ing the work to be performed, the owner implicitly warrants the adequacy and suitability of the plans and specifications for the purpose for which they are tendered.
>
> . . .
>
> Therefore, where delays result, as here, because of faulty specifications and plans, the owner will have to respond in damages for the resulting additional expenses realized by the contractor.

In the case before us there were no plans and specifications relating to the matter of blasting. Liability here is based upon negligence of the engineer. The jury found M. & P. suffered damages in the amount of $219,279.71. Therefore, the judgment in favor of M. & P. against the owner should be changed to a judgment against McGoodwin.

The engineer objected generally and specifically to the giving of instruction No. 44 on the grounds that there was no competent evidence to support such instruction. Instruction No. 44 reads:

> A contractor or builder does not impliedly warrant that he has engineering skill or the knowledge of an architect.

The general rule is that a contractor or builder impliedly warrants that the work he undertakes will be done in a good and workmanlike manner and will be reasonably fit for the intended purpose. *Coney* v. *Stewart,* 263 Ark. 148, 562 S.W.2d 619 (1978); *Wawak* v. *Stewart,* 247 Ark. 1093, 449 S.W.2d 922 (1970); 17A C.J.S. *Contracts* § 329 (1963). In the present case the owner employed a firm of engineers to do the engineering phase of the work and entrusted them to supervise the project from an engineering viewpoint. There is nothing in the record to indicate the owner or anyone else looked to the contractor for engineering skills. The fact that the contractor had an engineer on his staff, at least part of the time, in no manner indicates the owner was relying upon the

contractor to perform any engineering skill. The express duties of the contractor, according to the terms of the contract, were to construct the project in accordance with the plans and specifications which the owner's engineers had prepared. Therefore we see no prejudicial error in the giving of instruction 44.

The trial court gave instructions 26, 27, 28, 29, and 42, over the engineer's objections. Two of the instructions, 27 and 42, concern the owner's duty to supply correct plans and specifications to the contractor. The other three concern the engineer's duties and liability with respect to preparing the plans and supervising the work. We do not see any misstatement of the law in any of the five instructions, nor was any such error pointed out to the trial court by counsel. ARCP, Rule 51 requires that objections to instructions be specific; a general objection is insufficient. As to some of the challenged instructions the objection was that they were "an incorrect statement of the law." Such a general objection raises no point for review. *Capital Steel Co. v. Foster & Creighton Co.*, 264 Ark. 683, 574 S.W.2d 256 (1978). Another objection was that the instruction was not based on facts in evidence. If so, the particular instruction would be an abstract statement of law, but an abstract instruction is harmless unless it may mislead or confuse the jury. *Courson v. Chandler*, 258 Ark. 904, 529 S.W.2d 864 (1975). We are unable to perceive how any of the questioned instructions could have prejudiced the engineer, and in any case the possibility of such prejudice was not specifically brought to the attention of the trial judge.

The owner sought to recover an unliquidated sum of money from the contractor as a result of a claim of another contractor for damages resulting from the delay in completing the intake project. The owner had not paid the claim and the other contractor was not a party to the suit. Therefore, it was not error for the trial court to refuse to send this claim to the jury.

We need not discuss the matter of punitive damages against Hercules, for that claim was waived as a basis for reversal during oral argument before this court. The trial

court did not err in refusing to grant judgment N.O.V. or a new trial. The rulings by the trial court were not clearly against the evidence. *Clayton* v. *Wagnon,* 276 Ark. 124, 633 S.W.2d 19 (1982).

At a two-week trial all parties developed their proof or had an opportunity to do so. The jury settled the principal disputed issue of fact — that of fault. Its verdict was not adversely affected by the improper admission or exclusion of evidence or by prejudicially erroneous instructions. The case is remanded for the trial court to enter judgment in accordance with this opinion. The engineer was not the agent of the owner. Safeco is liable to the owner in the amount of its bond and is entitled to judgment over against the engineer. The owner is liable to the contractor for the sum of $174,735, representing the balance of its contract; and the contractor is entitled to damages in the amount of $219,279.71 against the engineer.

Modified and remanded.