Jim D. SWINK *v.* LASITER CONSTRUCTION, INC.

CA 05-563                                          229 S.W.3d 553

Court of Appeals of Arkansas
Opinion delivered February 22, 2006

[Rehearing denied April 5, 2006.]

Quattlebaum, Grooms, Tull & Burrow P.L.L.C., by: E.B Chiles IV and Brandon B. Cate, for appellant.

Newland & Associates, P.L.L.C., by: J. Richard Newland, Joel F. Hoover, and Ray S. Pierce, for appellee.

Robert J. Gladwin, Judge. Appellant Jim Swink appeals from a jury verdict awarding appellee Lasiter Construction a judgment for $60,500 for money Swink withheld as liquidated damages for delays in a construction project. The jury also awarded Lasiter $6,941.85 for additional landscape work. The trial court awarded Lasiter $71,037.40 in attorney's fees after reducing the hourly rates charged by Lasiter's attorneys and paralegals. Lasiter cross-appeals from the fee award, alleging that the hourly rates were reasonable. We affirm in part and reverse in part on direct appeal. We reverse and remand on cross-appeal.

Swink owns property on Highway 10 in western Pulaski County that he sought to develop in a project known as Montagne Court Phase I. White-Daters & Associates, Inc., were to be the project engineers. On September 12, 2002, Swink and Lasiter entered into a contract for the construction of the project. The contract, *inter alia*, provided that Lasiter would complete the project within 120 days of being ordered to begin construction. The contract also provided that, if Lasiter failed to timely complete the project, it would pay Swink liquidated damages of $500 per day, to be withheld from the final amount due Lasiter. The contract also provided a method for Lasiter to request additional

time to complete the project. An extension of time would not be automatically granted but granted upon terms Swink considered reasonable. If the delay was a continuing one, then only one notice was necessary. Lasiter began work on September 23, 2002, and substantially completed the project by June 2, 2003. The City of Little Rock accepted the project on June 19, 2003.

On October 20, 2003, Lasiter filed suit against Swink, seeking to collect $115,298.53, the balance due under the contract. The complaint also sought $41,599 in extended overhead costs generated by delays allegedly caused by Swink or his engineer. Lasiter also sought to foreclose on a lien filed contemporaneously with the complaint. Finally, Lasiter sought attorney's fees for enforcing its lien and for breach of contract.

Swink answered, denying liability and asserting that Lasiter had been paid all sums to which it was entitled. Swink filed a counterclaim, alleging that Lasiter had breached the contract by not completing work within 120 days after beginning construction and by not requesting extra time to complete the project as allowed under the contract. The counterclaim also alleged that Lasiter violated Ark. Code Ann. § 5-37-226 (Repl. 1997) by filing its lien and that Lasiter had damaged Swink by not properly giving notice of its lien. The counterclaim sought both compensatory and punitive damages, treble damages under section 5-37-226, and attorney's fees.

Michael Lasiter, a contractor for over twenty years, testified that the project engineers issued a work order to proceed with construction on September 16, 2002; however, Lasiter stated that he did not receive such a work order. He stated that there were delays almost from the start of the project, including not having a full set of plans until December 13, the waterline to Swink's residence not being noted or located on the plans, and groundwater seeping into the work. He added that these problems were part of Swink's responsibility in planning the project. He also identified three letters, dated October 15, 2002; December 31, 2002; and March 13, 2003, to the project engineers that he contended served as requests for additional time to complete the project.

The October 15 letter listed all three problems. The December 31 letter, written by estimator Lynn Harrell, contained a schedule calling for twenty-nine additional work days, weather permitting, to complete the project. Also attached to this letter were notes showing the daily weather conditions and the work

performed each day. The March 13 letter discussed the groundwater problem and stated that Carl Garner, a soils engineer, had suggested installing a French drain to alleviate the problem. The letter also noted that the groundwater problem was brought to the attention of the project engineers earlier in the project construction. Finally, the letter stated that Lasiter would not be responsible for delays attributable to the lack of engineering regarding the groundwater problem, delays from the lack of an easement necessary for the installation of the sewer line, and delays for having to relocate Swink's waterline.

Lasiter also testified that the French drain resolved the groundwater problem and allowed the project to be substantially completed by June 2, although some additional work was done on June 23 and in August. He stated that Swink's engineers stopped calculating liquidated damages on June 2. Lasiter stated that the October 15 letter was sent within seven days of encountering the groundwater problem and the lack of an easement for the sewer. He also stated that he did some extra work placing sod and grass over the easement area for which he was not paid.

Lasiter identified two estimates where liquidated damages were not withheld. He stated that his company was not paid for pay estimate 5. He identified the final pay estimate and revised final estimate, which withheld $69,500. Lasiter testified that he wrote a September 2, 2003, letter stating that Swink was responsible for all of the delays mentioned in the March 13 letter. The September 2 letter also stated that Swink did not have the property ready to begin construction until December 13 and that, by not issuing a notice to proceed, Swink waived his right to withhold liquidated damages.

Lasiter stated that he was seeking $150,000, which included the withheld liquidated damages. He stated that Lasiter had spent $318,223.21 to complete the project and that Swink had agreed to pay $321,000, although that sum was increased by the change orders. He said that Swink had paid only $181,655 to date.

On cross-examination, Lasiter admitted that the easement agreement was sent to his office on October 21 but that it did not include the grade plans. He also noted that the contract's special provisions concerning completion of the work and liquidated damages appear conflicting: one sentence stated that, should the contractor fail to complete the project on time, the owner shall immediately begin to withhold liquidated damages, while the last

sentence of that special provision stated that all liquidated damages shall be withheld from the final pay estimate.

Jim Burt, the former superintendent for Lasiter, testified that he had worked on two projects where White-Daters served as the engineer and that, in both cases, he never began work with a complete set of plans. He said that, although it is customary to receive a notice to proceed, one was not received on this project. He stated that the project was not completed within 120 days, as provided by the contract, because of several delays, including not having an easement for part of the sewer, a groundwater problem, and not having a full set of plans. He also said that the plans did not locate all existing utilities. He said that additional work was performed but that no additional days were sought or granted for this additional work.

Burt testified that Lasiter received the sewer plans on November 2 but did not receive the plans for the storm drain until mid-December, causing a delay. According to Burt, the lack of an easement for the sewer caused a delay because sewers are built from the deepest part first. He stated that work could not have started in the middle of the line due to possible misalignment. Another delay resulted from not having the plans approved by the city. Burt said that obtaining the easement and obtaining approval of the plans by the city was the responsibility of Swink or the engineers.

He next described the problem with groundwater keeping the site muddy all of the time. Burt said that the engineers were advised of the problem several times before Lasiter hired its own soils engineer, Carl Garner, who suggested a French drain, which solved the problem. He also described several instances of additional work by Lasiter for which Lasiter did not seek additional time because it did not believe that the contract time had started due to the lack of a notice to proceed. He also stated that Swink and the engineers did not mention liquidated damages until the end of the project. According to Burt, the project was substantially complete but additional work was done on June 23, 2003, installing storm-drain pipe.

Terri Mathis, Lasiter's bookkeeper and controller, testified that she did not receive payment for pay estimate 5 in the amount of $60,956.68. She stated that she called Swink about the matter but that he did not mention liquidated damages. She stated that all of the extra costs that Lasiter incurred, including the landscaping, totaled $55,289.09. On cross-examination, she admitted that the

contract allowed Lasiter a method to request payment for this extra work but that she was not familiar with that method. She also admitted that she had no knowledge of Lasiter's billing Swink for this extra work. The charge for the landscape work was $6,941.85. She stated that this was the "hard" cost.

Jim Swink testified that the site was wet in December 2002, due to a lot of rain, and asserted that the only delay Lasiter told him about was due to the weather. He also stated that Lasiter never asked for an extension of time but that, if the engineer had so recommended, he would have agreed to one. Swink stated that the time for completion had expired prior to the time for pay estimates 3, 4, and 5 but that all three estimates were approved for payment. According to Swink, he started calculating the liquidated damages the day after the 120-day period expired and withheld them from the final pay estimate, as required by the contract. He also said that he told Jim Burt and Lasiter that he was charging liquidated damages, both before and after the 120-day deadline expired. He stated that he did not pay estimate 5 because the liquidated damages exceeded the amount requested in that estimate. He also admitted that he withheld liquidated damages but did not know that Lasiter was going to seek payment for additional work.

Swink admitted that he was a convicted felon, having pled guilty to aiding and abetting securities fraud. He disputed Jim Burt's testimony that the site was so muddy that it would "suck your boots off." He stated that Lasiter ruptured the water line to his house but disputed Lasiter's assertion of when it happened or that it delayed the project three weeks.

Swink asserted that Lasiter's crew did not return for approximately six weeks, from September to November. He admitted that it may have rained a day or two during this time. Swink testified that, during his fall conversations with Burt, he asked if Burt was aware of the 120-day deadline and that Lasiter could be assessed liquidated damages of $500 per day and that Burt was aware. He also related another telephone conversation with Burt that occurred when he was angry at Burt for the delays and that Burt told him that Michael Lasiter tells him (Burt) where to send the crews and equipment and that he had been moved to another project. He also asserted that Lasiter did very little work in January.

Next, Swink recounted the Christmas meeting with Lynn Harrell at Lasiter's office. He stated that Harrell was told that the contract would be enforced, meaning that liquidated damages

would be withheld. He also stated that Michael Lasiter joined the meeting and that there was a discussion about the delays being caused by rain. Swink stated that the result of this meeting was Lasiter's December 31 letter. He stated that Harrell and Lasiter assured him that they would give the project priority and arrange a schedule for completion and that he agreed to that schedule.

Brian Dale, an engineer with White-Daters, testified that he was involved in the project and that he was familiar with the contract and its provision calling for completion within 120 days. He stated that he prepared and sent the notice to proceed on September 16 and that Lasiter started work on September 23. He said that neither Lasiter nor the engineers were aware of the location of the water line to Swink's residence because it was a private service line. It was his opinion that the delay in dealing with this water line did not cause Lasiter to miss the 120-day deadline.

Dale admitted that it was necessary to obtain an easement for the sewer system but that the delay did not cause Lasiter to miss the deadline. However, he asserted that Lasiter could have begun in the middle of the sewer while the easement issue was resolved. He also stated that it was not unusual for all of the plans not to be prepared or not to have all city approvals prior to beginning construction.

According to Dale, he did not receive Lasiter's October 15 letter and indicated that he did not consider it a request for an extension of time to complete the project. He also stated that the statements concerning groundwater would not have alarmed him because it was early in the project and groundwater is frequently encountered. He also described a fall conversation with Jim Burt concerning groundwater and stated that he wanted to wait until March 2003 to address the groundwater issue. He also admitted that the site was wet between October and March but asserted that this site was no wetter than other project sites. He said that Carl Garner's suggestion of French drains was consistent with his fall conversation with Burt because, by March, all utilities had been installed and it was the proper time to address the issue before installing the roadbed.

Dale said that Lasiter's December 31 letter was not considered a request for an extension of time because it did not specifically mention that Lasiter needed additional time. He stated that the letter gave an estimate of twenty-nine days to complete the

project. He said that he made the liquidated-damages calculations and that nothing in the contract required Swink to notify Lasiter that liquidated damages were being withheld or calculated. He testified that pay estimate 6 was intended to be final pay estimate but that it incorrectly calculated the damages from the date of the contract rather than the date of the notice to proceed.

On cross-examination, Dale admitted that Lasiter could not have begun work on the storm drains until after the plans were approved on October 16 by Little Rock Wastewater. He also asserted that Lasiter was not ready to do that work. He also stated that the storm drain was not staked out until December 13, roughly ninety days from the notice to proceed.

Joe White, a civil engineer with White-Daters, testified that he was primarily responsible for drafting the contract for the project. He described the contract as fairly standard in the industry, stating that the $500-per-day figure for the liquidated damages was about average and, in part, based upon the size of the project. He stated that he was familiar with the contract language calling for the liquidated damages to be withheld from the contractor's final payment and that the language calling for the damages to be immediately withheld referred to the date that calculation of damages was to begin. The time begins to run from the notice to proceed, he said, adding that giving a contractor fifteen days to file a claim for extra work was generous. According to White, liquidated damages were not withheld from pay estimates 3 or 4 because the contract required that they be deducted from the final payment.

White stated that time was important on the project and that delays can occur, causing the contractor to need additional time. He also said that it was important for any requests for additional time to be in writing. White said that he signed the notice to proceed on September 16 and that Lasiter began work on September 23. He admitted that not all of the plans were approved by the city until after the project began but that this was the case in nine of ten projects. He added that Lasiter could have been working on other parts of the project while waiting for the approvals.

According to White, the problem with the water line to Swink's residence did not delay Lasiter. He also said that the problem in obtaining the easement for the sewer was not unusual and did not delay Lasiter because work could have begun in the middle of the line, at manhole five. He said that Lasiter's October

15 letter was not a request for additional time and that the issues raised were typical problems. He said that Lasiter indicated that it encountered the waterline on October 11, within seven days of the October 15 letter. He added that, if Michael Lasiter said that they encountered groundwater within seven days of October 15, he could not dispute that.

White described groundwater as common in west Little Rock and stated that he wanted to get all of the utilities installed before addressing the groundwater and French drains because the installation of the utility trenches would lower the groundwater. He said that the French drain would be the last item installed because it is the shallowest. He said that it was not necessary to address the issue until March, when all of the utilities were in place. He denied that it was a failure on White-Daters's part to deal with the issue before March. Although the storm-drain plans were approved on October 16, White said that Lasiter did not ask that the drain be staked out prior to December. He also said that White-Daters did not prevent Lasiter from asking that the drain be laid out earlier and suggested that it could have been installed in October.

Lasiter's December 31 letter did not alarm White because Lasiter said that it could complete the job in twenty-nine days, two weeks after the deadline. He said that it was reasonable for Lasiter to ask for twenty-nine more days.

White said that it was possible for Lasiter to finish the job within 120 days but that they did not finish until June. He also said that it was no surprise that Swink withheld liquidated damages. He asserted that Lasiter gave Swink notice of the lien at a meeting with Swink, Michael Lasiter, Lynn Harrell, Jim Burt, and himself in attendance. He said that he was mistaken when he said in his deposition that Lasiter could wait until a problem was resolved before seeking an extension of time. He also asserted that Lasiter did not make its one claim necessary for a continuing delay.

At the close of Lasiter's case and again, at the close of all of the evidence, Swink made motions for directed verdicts, which were denied. The case was submitted to the jury on interrogatories. The jury answered the interrogatories as follows:

INTERROGATORY NO. 1
With the October 15, 2002, letter from Michael Lasiter to Brian Dale, did Lasiter Construction, within 7 days of the event causing

delay, request from Mr. Swink an extension of time to complete the contract beyond the 120 days provided by the contract? YES. (10 votes)

INTERROGATORY NO. 2
In response to the October 15, 2002, letter from Michael Lasiter to Brian Dale, did Mr. Swink grant Lasiter Construction an extension of time to complete the contract beyond the 120 days provided by the contract? NO. (unanimous)

INTERROGATORY NO. 3
With the December 31, 2002, letter from Lynn Harrell to Joe White, did Lasiter Construction, within 7 days of the event causing delay, request from Mr. Swink an extension of time to complete the contract beyond the 120 days provided by the contract? YES. (10 votes)

INTERROGATORY NO. 4
In response to the December 31, 2002, letter from Lynn Harrell to Joe White, did Mr. Swink grant Lasiter Construction an extension of time to complete the contract beyond the 120 days provided by the contract? YES. (9 votes)

INTERROGATORY NO. 5
With the March 13, 2003, letter from Michael Lasiter to Joe White, did Lasiter Construction, within 7 days of the event causing delay, request from Mr. Swink an extension of time to complete the contract beyond the 120 days provided by the contract? YES. (11 votes)

INTERROGATORY NO. 6
In response to the March 13, 2003, letter from Michael Lasiter to Joe White, did Mr. Swink grant Lasiter Construction an extension of time to complete the contract? NO. (unanimous)

INTERROGATORY NO. 7
If you answered yes to Interrogatory No. 2, and/or Interrogatory No. 4, and/or Interrogatory No. 6, then answer Interrogatory No. 7. Otherwise, go to Interrogatory No. 8. Without including the amount of two checks that Mr. Swink tendered to Lasiter Construction ($22,563.53 on August 25, 2003, and $3,351.98 on October 16, 2003), what amount of the $69,500 in liquidated damages that Mr. Swink withheld should be awarded to Lasiter Construction? $60,500.00. (unanimous)

INTERROGATORY NO. 8
Did Lasiter Construction perform work for Mr. Swink outside the contract for which it is entitled to payment? YES. (unanimous)

INTERROGATORY NO. 9
Did Lasiter Construction submit written claims for extra costs to Mr. Swink within fifteen days after the additional work outside the contract had been completed? YES. (unanimous)

INTERROGATORY NO. 10
What amount does Mr. Swink owe Lasiter Construction for Lasiter Construction performing additional work outside the contract? $6,941.85–Landscape (unanimous)

INTERROGATORY NO. 11
Did Lasiter Construction file its lien against Mr. Swink's property on October 20, 2003, knowing that it had not performed work within the last 120 days? NO. (unanimous)

Judgment was entered on the jury verdict on September 9, 2004. Swink filed a motion for judgment notwithstanding the verdict on September 23, 2004. The motion sought a new trial or, in the alternative, a remittitur on both the liquidated damages and landscape claims. The motion was deemed denied on October 25, 2004. Lasiter filed its motion seeking attorney's fees of $124,936.73 on September 1, 2004, prior to entry of judgment.[1] Lasiter asserted that the fees were authorized under Ark. Code Ann. §§ 18-44-128 (Repl. 2003) and 16-22-308 (Repl. 1999). On November 12, 2004, the trial court awarded Lasiter attorney's fees of $71,037.40, after reducing the hourly rates charged by Lasiter's attorneys and paralegals. The trial court did not explain its reasons for reducing the hourly rates. Swink filed his notice of appeal on November 18, 2004, and Lasiter filed its notice of cross-appeal on November 22, 2004. Lasiter filed an amended motion for fees on September 23, 2004. An agreed amended order as to fees was entered on February 4, 2005. Swink filed a notice of appeal from the amended order on February 7, 2005. Lasiter cross-appealed on February 10, 2005.

On appeal, Swink raises nine points: that the trial court abused its discretion by not instructing the jury to disregard Lasiter's "send-a-message" argument; that the trial court abused its

---

[1] We note that there are some slight mathematical errors concerning the total fees sought in Lasiter's motion.

discretion by not granting a mistrial for Lasiter's impeachment of Swink before Swink took the witness stand; that the trial court abused its discretion in admitting evidence of Swink's prior conviction and in permitting him to be questioned on the details of the conviction; that the judgment that Swink improperly withheld liquidated damages is not supported by substantial evidence; that the liquidated-damages award is not supported by substantial evidence; that the jury's responses to the liquidated-damages interrogatories were inconsistent; that the extra-costs judgment is not supported by substantial evidence; that the extra-costs damages award is not supported by substantial evidence; and that the judgment dismissing Swink's counterclaim is not supported by substantial evidence. Lasiter, on cross-appeal, raises three points: that the trial court abused its discretion in reducing the hourly rates for Lasiter's attorneys; that the trial court abused its discretion because the request for fees was reasonable considering the amount of money potentially at stake in the litigation; and that the trial court abused its discretion because the request for fees was reasonable given the difference between the fees charged to the prevailing and losing parties.

*Direct Appeal*

*I. Improper Jury Argument*

For his first point, Swink argues that the trial court erred by failing to instruct the jury to disregard Lasiter's closing argument in which it asked the jury "[s]end them a message to do what's right." Swink argues that such an argument is improper where, as in this case, no punitive damages were sought. A trial judge has wide discretion to control counsel's argument, and we do not reverse that decision absent a manifest abuse of that discretion. *Smith v. State*, 352 Ark. 92, 98 S.W.3d 433 (2003); *Butler Mfg. Co. v. Hughes*, 292 Ark. 198, 729 S.W.2d 142 (1987).

■ This argument has been waived because Swink did not object at the first opportunity. After Lasiter's first argument asking the jury to "send a message" was made, Swink made no objection and proceeded to give his closing argument. In the rebuttal portion of its argument, Lasiter again asked the jury to "[s]end them the message that this is unacceptable, and tell them to pay for what they got." Swink did not object until after Lasiter had completed its argument and the trial court was ready to submit the case to the jury. In similar situations, the supreme court has held that, where

a party waited until after closing arguments when out of the presence of the jury to make a motion for mistrial, that party waived the objection by not giving the trial court the opportunity to correct any error committed during the closing argument. *Madden v. Aldrich*, 346 Ark. 405, 58 S.W.3d 342 (2001); *John Cheeseman Trucking, Inc. v. Dougan*, 313 Ark. 229, 853 S.W.2d 278 (1993); *Butler Mfg. Co., supra*.

In his reply brief, Swink argues that the argument is not waived because, even if he waived the first instance of the improper argument, he promptly objected when Lasiter repeated the argument in its rebuttal. However, it is clear that Swink waited until after Lasiter finished its rebuttal argument before raising the objection. After Lasiter completed its rebuttal argument, the trial court started to address an issue concerning a juror who had to leave at a certain time in order to catch a flight. At that point, Swink's attorney asked to approach the bench and made his objection to Lasiter's argument. The trial court responded, "[o]kay. I understand," before resuming its consideration of the issue of the juror with a flight to catch. Because Swink did not object at the first opportunity, we affirm on this point.

## II. Swink's Prior Conviction

Swink's second and third points deal with Lasiter's use of Swink's prior conviction for impeachment. In those points, Swink argues that the trial court erred in allowing Lasiter to impeach him prior to his taking the witness stand and in allowing Lasiter to question him concerning the details of the conviction.

The issue arose during *voir dire* examination of the jury when Lasiter's counsel asked the prospective jurors whether they had knowledge of Swink's former business, a securities firm known as Swink & Company. One juror indicated that he was aware of some accusations of securities violations. Some of the other jurors indicated that they had heard the name Swink & Company, including one who indicated that criminal charges were involved. Lasiter's attorney then asked the jury panel whether any of the jury panel knew someone with a criminal record. Several jurors indicated that they knew people with criminal records or people in jail. At this point, Swink objected, stating that it was not proper for *voir dire*. Lasiter's counsel indicated that he wanted to ask a follow-up question about family members in jail. The trial court responded, "[o]kay."

While Michael Lasiter was testifying as to the amount of money Swink owed Lasiter, he stated that he believed that he was being taken advantage of and added that, "with Mr. Swink's criminal history, I believe he is trying to do it here again." Swink objected and asked for a mistrial, arguing that he could not be impeached until he took the stand. The trial court instructed the jury to "disregard the comment concerning the criminal matter. You will disregard that last comment by the witness." The court also ruled that, if the impeachment testimony of Swink did not come in during Lasiter's case in chief and Swink had a basis for a mistrial, Swink could seek a mistrial at the close of Lasiter's case.

Later, Lasiter called Swink as a witness during its case in chief. Swink admitted to being a convicted felon, having pled guilty to aiding and abetting securities fraud. When counsel sought to ask a follow-up question, Swink objected, arguing that, once Swink admitted to the fact of conviction, he could not be asked about the details of the conviction. The trial court sustained the objection. Swink also moved for a mistrial, which was denied. Swink also asked for a limiting instruction to the jury. The trial court said that it would consider such an instruction during a recess. At the close of Lasiter's case in chief, Swink renewed his motion for a mistrial based on the comments during *voir dire* and Michael Lasiter's comment about Swink's past. The trial court denied the motion for a mistrial, ruling that Michael Lasiter was not actually reading the details of Swink's conviction and that a curative instruction was not necessary.

Arkansas Rule of Evidence 609(a) provides in part that,

> [f]or the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted but only if the crime (1) was punishable by death or imprisonment in excess of one year, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party or a witness or (2) involved dishonesty or false statement, regardless of the punishment.

The admissibility of prior convictions must be decided on a case-by-case basis. *Benson v. State*, 357 Ark. 43, 160 S.W.3d 341 (2004). The trial court has considerable discretion in determining whether the probative value of a prior conviction outweighs its prejudicial effect, and that decision will not be reversed absent abuse. *Id.*; *Turner v. State*, 325 Ark. 237, 926 S.W.2d 843 (1996).

■ Swink argues that the trial court should have declared a mistrial when Michael Lasiter referred to Swink's being a convicted felon because it was an attempt to impeach Swink prior to his taking the stand and putting his credibility at issue. The trial court had sustained Swink's objection but denied the motion for a mistrial and admonished the jury to disregard the comment. It is well settled that an admonition to the jury usually cures a prejudicial statement unless it is so patently inflammatory that justice could not be served by continuing the trial. *Moore v. State*, 323 Ark. 529, 915 S.W.2d 284 (1996); *King v. State*, 317 Ark. 293, 877 S.W.2d 583 (1994). Swink cites several cases from other states to show that it is improper to allow impeachment evidence before the witness sought to be impeached takes the stand. However, those cases do not show how the statement at issue in the present case is so patently prejudicial as to call for a mistrial. Further, Swink did take the stand and admitted that he was, in fact, a convicted felon. This usually removes error in the admission of evidence. *Long v. State*, 607 S.W.2d 482 (Tenn. Crim. App. 1980); *see also Isbell v. State*, 326 Ark. 17, 931 S.W.2d 74 (1996). Therefore, Swink cannot show prejudice on this point.

Swink relies on the supreme court's decision in *Floyd v. State*, 278 Ark. 342, 645 S.W.2d 690 (1983), for the proposition that he cannot be questioned about the details of his prior conviction. However, in *Lincoln v. State*, 12 Ark. App. 46, 670 S.W.2d 819 (1984), this court held that the *Floyd* court rejected the argument that, when a witness takes the stand and admits he has been convicted of a felony, he has been impeached and the opposing party should not be allowed to further impeach him.

■ We do not see any prejudice in Lasiter's asking Swink a question attempting to clarify Swink's testimony about the nature of the conviction. A convicted felon can be questioned about the nature of the offense. *Long, supra.* This is because Rule 609, by requiring that probative value be weighed against prejudice and by admitting all convictions involving dishonesty, undeniably contemplates that the jury will know just what crimes the witness has been convicted of. *Simmons v. State*, 278 Ark. 305, 645 S.W.2d 680 (1983). We affirm on these points.

### III. Liquidated-Damages Issues

In his fourth, fifth, and sixth points, Swink contends that the jury's verdict on the liquidated damages is not supported by

substantial evidence and that the jury's answers to the interrogatories on the liquidated damages are inconsistent. When a jury verdict is challenged, the court will affirm the verdict and judgment of the trial court if the verdict is supported by any substantial evidence, with the evidence and all reasonable inferences therefrom examined in the light most favorable to the appellee. *Clark v. Farmers Exch., Inc.*, 347 Ark. 81, 61 S.W.3d 140 (2001).

In its answers to the interrogatories, the jury found that each letter from Lasiter to Swink (October 15, 2002, December 31, 2002, March 13, 2003) constituted a request for extension of time for Lasiter to complete the project. However, the jury found that Swink approved an extension of time based only upon the December 31 letter. Swink argues that there is no substantial evidence that Lasiter requested, and Swink granted, additional time to complete the project. Swink also argues that there is no evidence to support a finding that he granted Lasiter an additional 120 days to complete the project.[2]

Swink argues that the October 15 letter cannot be a request for an extension of time. Under the contract, a request for an extension of time had to be made within seven days of the event causing the delay. Further, if the delay is a continuing one, only one request for extension is necessary. Michael Lasiter testified that he considered the October 15 letter to be a request for an extension of time and that the groundwater problem was a continuing one. The field notes attached to the December 31 letter show that the first day it was too wet for Lasiter to work was October 14. There is no explanation of why it was too wet that day. Further, Joe White said that he could not dispute Michael Lasiter's testimony that the groundwater was first encountered less than seven days prior to the October 15 letter.

The fact that the jury did not find that Swink granted an extension of time based on the October 15 letter is of no moment because Swink was required to grant a reasonable request for an extension of time. *City of Whitehall v. Southern Mech. Contracting, Inc.*, 269 Ark. 563, 599 S.W.2d 430 (Ark. App. 1980). There is nothing in the contract that requires Swink to immediately grant or deny each request for an extension. Further, Swink did grant an extension based on the December 31 letter. He

---

[2] Both parties agree that the jury's award of $60,500 corresponds to 121 days of liquidated damages.

testified that, during a meeting with Lynn Harrell and Michael Lasiter, they told him that they would come up with a schedule to complete the project and that the extra twenty-nine days would put the project only a few days over the deadline, so he agreed to extend the deadline. This is substantial evidence to support the jury's verdict. After all, the jury was not asked how many days Swink agreed to extend the deadline. *See Schmidt v. Pearson, Evans, & Chadwick*, 326 Ark. 499, 931 S.W.2d 774 (1996).

As part of this point, Swink also argues that the award of liquidated damages withheld should be remitted because the award is irrational or based upon conjecture. The argument is that there is no way to calculate how the jury arrived at the 121-day figure. Because of the unusual amount involved, the jury obviously had some type of formula in mind when it arrived at its damages figure. One possible explanation for how the jury arrived at the figure for the liquidated-damages award to Lasiter is as follows: if the 120-day deadline is calculated as beginning September 23, the date Lasiter commenced construction, the deadline would expire on January 20. If that deadline is extended twenty-nine days in accordance with Lasiter's December 31 letter, the new deadline becomes February 18. That date is 121 days from June 19, the date the City of Little Rock accepted the work. Another explanation could be, as Lasiter suggests in its brief, that the jury was awarding Lasiter the approximate amount of the unpaid pay estimate 5 in the amount of $60,956.68.

Swink also argues that the jury's answers to interrogatories 4 and 7 are inconsistent because only nine jurors agreed in interrogatory 4 that Swink granted Lasiter an extension of time beyond 120 days to complete the work, while all twelve jurors agreed in interrogatory 7 to award Lasiter $60,500 of the liquidated damages Swink had withheld. This verdict is consistent because each interrogatory answered by the jury is a special verdict on that particular fact. *Ozarks Unlimited Res. Coop., Inc. v. Daniels*, 333 Ark. 214, 969 S.W.2d 169 (1998); *Carroll-Boone Water Dist. v. M.&P. Equip. Co.*, 280 Ark. 560, 661 S.W.2d 345 (1983); *McChristian v. Hooten*, 245 Ark. 1045, 436 S.W.2d 844 (1969). In *McChristian*, the appellant argued that the jury's answers to the interrogatories were inconsistent and conflicting because two of the ten jurors agreeing on the issue of damages had not agreed on the issue of liability. The supreme court, citing Arkansas Constitution Amendment 16, held

that it was not necessary that each interrogatory be signed by the same nine jurors in order for each interrogatory to be considered the verdict of the jury on such issue.

We affirm on these points.

### IV. "Extra Work" Landscape Damages

In his seventh and eighth points, Swink contends that the judgment awarding Lasiter damages for its extra landscape work is not supported by substantial evidence. The standard of review is whether the verdict is supported by any substantial evidence, with the evidence and all reasonable inferences therefrom examined in the light most favorable to the appellee. *Clark, supra.*

In interrogatory 8, the jury found that Lasiter did extra work outside the contract for which it is entitled to payment. In interrogatory 9, the jury found that Lasiter submitted written claims for this extra work within fifteen days of completing the extra work. In interrogatory 10, the jury found that Lasiter was entitled to $6,941.85 for the extra work. Swink argues that there is no evidence that Lasiter complied with the contract's terms regarding the submission of extra work for payment. The contract required Lasiter to submit claims for extra costs to Swink within fifteen days of performing the additional work. Lasiter's book-keeper, Terri Mathis, stated that Swink was never presented a bill for these extra costs. Michael Lasiter and Mathis both testified that Mathis did not prepare the figures for the extra-work costs until approximately four weeks prior to trial. Lasiter contends that the provision requiring submission of claims for extra work within fifteen days does not apply because Swink ordered the extra work. However, there is nothing in the record to show that Swink ordered the landscaping work. We hold that there is no substantial evidence to support the jury's answer to interrogatory 9 that Lasiter submitted its written claim for the extra work within fifteen days of performing that work. Because there is no substantial evidence to support the jury's answer to interrogatory 9, the jury's award of the extra-work costs cannot stand. In order to recover those costs, Lasiter was required to timely submit its claim. *Wait v. Stanton & Collamore*, 104 Ark. 9, 147 S.W. 446 (1912). We reverse on this point.

## V. Counterclaim

■ In his ninth point, Swink argues that the trial court erred in dismissing his counterclaim. The counterclaim alleged that Lasiter improperly filed its lien in violation of Ark. Code Ann. § 5-37-226(a).[3] In interrogatory 11, the jury found that Lasiter did not file its lien on October 20, 2003, knowing that it had not performed work within 120 days of filing the lien. Swink's argument is directed to a finding that the jury was not asked to make. He is arguing that Lasiter's lien filing was untimely, while the jury was asked whether Lasiter knew that it had not performed any work within 120 days of filing its lien. Here, Michael Lasiter testified that the last work on the project was on June 23, 2003, and unspecified days in August, within 120 days of the lien. Therefore, substantial evidence supports the jury's answer to interrogatory 11 that Lasiter did not file its lien knowing that no work had been performed within 120 days of the lien filing.

### Lasiter's Cross-appeal

In its cross-appeal, Lasiter challenges the trial court's award of attorney's fees. Lasiter argues that the trial court abused its discretion by reducing the hourly rates charged by Lasiter's attorneys. Lasiter sought fees under both the general fee statute, Ark. Code Ann. § 16-22-308 (Repl. 1999), and under Ark. Code Ann. § 18-44-128 (Repl. 2003), for enforcing its lien. The trial court's order relied on section 16-22-308. The trial court granted a fee after reducing the hourly rates charged but did not explain why it was necessary to reduce the rates.

A trial court is not required to award attorney's fees, and because of the trial judge's intimate acquaintance with the trial proceedings and the quality of service rendered by the prevailing

---

[3] Section 5-37-226(a) provides:

It shall be unlawful for any person ... to have placed of record ... any instrument clouding or adversely affecting the title or interest of the true owner ... or clouding or adversely affecting any bona fide interest in real property with the knowledge of the instrument's lack of authenticity or genuineness, and with the intent of clouding, adversely affecting, impairing, or discrediting the title or other interest in the real property, which may prevent the true owner ... from disposing of the real property, transferring or granting any interest in the real property, or with the intent of procuring money or value from the true owner ... to clear the instrument from the records of the office of the recorder.

party's counsel, we usually recognize the superior perspective of the trial judge in determining whether to award attorney's fees. *Marcum v. Wengert*, 344 Ark. 153, 40 S.W.3d 230 (2001); *Jones v. Abraham*, 341 Ark. 66, 15 S.W.3d 310 (2000); *Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990). The decision to award attorney's fees and the amount to award are discretionary determinations that will be reversed only if the appellant can demonstrate that the trial court abused its discretion. *Nelson v. River Valley Bank & Trust*, 334 Ark. 172, 971 S.W.2d 777 (1998); *Burns v. Burns*, 312 Ark. 61, 847 S.W.2d 23 (1993).

■ When addressing a trial court's award of attorney's fees, our courts have often observed that there is no fixed formula in determining what is reasonable. *See South Beach Beverage Co., Inc. v. Harris Brands, Inc.*, 355 Ark. 347, 138 S.W.3d 102 (2003); *Phi Kappa Tau Housing Corp. v. Wengert*, 350 Ark. 335, 86 S.W.3d 856 (2002); *see also Chrisco, supra.* It has, however, been held that a trial court should be guided in that determination by the following long recognized factors:

> (1) the experience and ability of counsel; (2) the time and labor required to perform the legal service properly; (3) the amount involved in the case and the results obtained; (4) the novelty and difficulty of the issues involved; (5) the fee customarily charged in the locality for similar services; (6) whether the fee is fixed or contingent; (7) the time limitations imposed upon the client in the circumstances; and (8) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

*South Beach Beverage*, 355 Ark. at 356, 138 S.W.3d at 108; *see also Phi Kappa Tau Housing Corp.*, 350 Ark. at 341, 86 S.W.3d at 860. Here, the trial court specifically stated that it was considering the appropriate factors and discussed some of those factors. The court specifically found that the hours claimed were reasonable. The court, however, did not state why it believed that the hourly rates charged should be reduced. This failure to explain the reason for the reduction in the hourly rates warrants a remand for further explanation. *Bailey v. Rahe*, 355 Ark. 560, 142 S.W.3d 634 (2004).

In *Bailey*, a guardianship case, the trial judge made no findings of fact justifying a reduction in the attorney's hourly rate from $150 to $125. The supreme court reversed, stating: "[W]e are unable to discern exactly on what basis [the trial court] did so."

355 Ark. at 566, 142 S.W.3d at 638. The supreme court instructed the trial court to consider the relevant factors, including the hourly rate. Other cases have followed *Bailey*. *See Phelan v. Discover Bank*, 361 Ark. 138, 205 S.W.3d 145 (2005); *Scott v. Estate of Prendergast*, 90 Ark. App. 66, 204 S.W.3d 110 (2005). *See also Little Rock Wastewater Util. v. Larry Moyer Trucking, Inc.*, 321 Ark. 303, 902 S.W.2d 760 (1995) (remanding an attorney fee issue for reconsideration where the trial court's order gave no explanation for the denial of fees under Ark. Code Ann. § 16-22-308). Because the reason for the trial court's reduction in the attorneys' hourly rates is not readily apparent, we reverse on cross-appeal.

Affirmed in part, reversed in part on direct appeal. Reversed and remanded on cross-appeal.

ROBBINS and CRABTREE, JJ., agree.